In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-3726, 14-3737

MICHELS CORPORATION,

*Plaintiff-Counterclaim Defendant-Appellant*,

PIPE LINE CONTRACTORS ASSOCIATION,

*Intervening Plaintiff-Appellant*,

*v.*

CENTRAL STATES, SOUTHEAST, AND SOUTHWEST AREAS PENSION FUND, *et al.*,

*Defendants-Counterclaim Plaintiffs-Appellees*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-4144 — **Charles R. Norgle**, *Judge*.

ARGUED JUNE 5, 2015 — DECIDED SEPTEMBER 2, 2015

Before WOOD, *Chief Judge,* and FLAUM and EASTERBROOK, *Circuit Judges*.

WOOD, *Chief Judge*. This case raises a familiar problem for pension funds: when did an employer's obligation to contribute to the fund end? That question turns on when the governing collective bargaining agreement (CBA) between a multi-

employer group and a union terminated and how one should characterize a series of temporary "extensions" of the CBA. Several common issues are *not* before us: we are not concerned with withdrawal liability on the part of the employer; we are not concerned about any possible duty to arbitrate contested points; and in the end (despite considerable attention to the point in the briefs) the standard of review does not matter.

Cutting through the clutter, we conclude that the parties to the CBA in question terminated it in accordance with its terms effective January 31, 2011. Thereafter, the union and the employer group entered into a series of short-term agreements that had the effect of extending the CBA's terms for the designated periods while the parties negotiated. The interim agreement that took effect on November 15, 2011, however, was different: it eliminated the employers' duty to contribute to the pension fund and extended all other terms of the CBA. The district court held that this was not sufficient to end the employers' duty to contribute and thus granted summary judgment for the pension fund. We reverse. The CBA imposing the duty to contribute had long since expired by November of 2011, and there was nothing to prevent the parties from agreeing to the new arrangement.

# I

Michels Corporation is a pipeline construction company based in Brownsville, Wisconsin. It is a member of the Pipe Line Contractors Association (PLCA), a trade association that (among other things) negotiates collective bargaining agreements on behalf of its employer members with the relevant unions—in this case, the International Brotherhood of Team-

sters (the Union). The Central States, Southeast, and Southwest Areas Pension Fund (the Fund) is a multiemployer pension plan. See 29 U.S.C. § 1000(2), (3), and (37). A board of trustees, half of whom are appointed by contributing employers and the other half by the unions representing the plan participants, runs the Fund.

In February 2006, the PLCA and the Union entered into a collective bargaining agreement known as the National Pipeline Agreement (the 2006 CBA). Article XV(C) of the 2006 CBA addressed the duration of the agreement; it stated that "[t]he provisions of this Agreement shall continue in full force and effect until January 31, 2011, and thereafter from year to year unless terminated at the option of either party after sixty (60) days' notice in writing to the other." Schedule A of the 2006 CBA laid out the timing and amount of contributions that participating employers needed to make to the Fund. Schedule B of the 2006 CBA, called the National Pipeline Participation Agreement, spelled out the relationship among the employers, the Union, and the Fund. It included the following language:

> NOW, THEREFORE, IT IS AGREED by and between the undersigned Employer and the [Union] that such Employer hereby subscribes to the various agreements and declarations of trust and policies and procedures of the particular funds into which such Employer will be required to make contributions pursuant to the National Pipe Line Agreement, and agrees to be bound thereby and to amendments made or to be made thereto; and authorizes the parties to such trust agreements to name the trustees and successor trusts, and to

administer the trusts; and does hereby ratify and accept such trustees and the terms and conditions of said trusts as fully and as completely as if made by the undersigned Employer; provided, however that no amendments or provisions of said trust agreements shall bind the Employer for any financial obligations or dues delinquency determinations beyond that set forth in the National Pipe Line Agreement pursuant to which such contributions are made.

On August 9, 2010, in compliance with Article XV(C), the PLCA informed the Union that it intended to terminate the 2006 CBA on January 31, 2011, and begin negotiations for a new agreement. Just before the end of January, however, the parties signed a letter agreement extending the terms of the 2006 CBA for one month, to February 28, 2011. This proved to be the first of eight such extensions; the last one extended the 2006 CBA's terms from September 1, 2011, to November 15, 2011. Consistently with the obligations in the 2006 CBA and the commitments in the letter agreements to continue operating under the 2006 CBA's provisions, Michels continued to contribute to the Fund throughout those extensions.

The day before the eighth extension expired, the parties shifted course. They agreed that the employers would cease making contributions to the Fund as of November 15, 2011; that they would make comparable payments to an escrow fund until a fund "mutually acceptable to the Parties" was designated; and that they would otherwise extend the terms of the 2006 CBA until December 31, 2011. The pertinent language of the November 15, 2011, agreement, which figures prominently in this appeal, is as follows:

## AMENDMENT TO AND EXTENSION OF COLLECTIVE BARGAINING AGREEMENT BETWEEN PIPE LINE CONTRACTORS ASSOCIATION AND THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

WHEREAS, the current National Pipe Line Agreement ("CBA") between the Pipe Line Contractors Association and … the [Union], as previously extended, expires at midnight, November 15, 2011;

WHEREAS, the Parties have reached agreement that the PLCA may cease all contributions to the [Fund];

WHEREAS, agreement on certain other issues has not been reached;

WHEREAS, the Parties wish to give formal notice of this decision to [the Fund] in order to preclude any contention by [the Fund] that one or more members of PLCA has an obligation to contribute to [the Fund] under the Agreement for any period after November 15, 2011;

. . .

NOW, THEREFORE, BE IT:

. . .

RESOLVED THAT, Section 1(a) of Article V of the CBA shall be amended to read as follows:

(a) … [A]s of November 16, 2011, no Employer shall have an obligation to contribute to [the Fund]. The amount of those pension contribu-

tions, as well as the amount of all pension contributions on behalf of Travelers, shall be made to a plan or plans mutually acceptable to the Parties. Until the Parties agree upon a mutually acceptable plan or plans, all funds that would otherwise be remitted to [the Fund] shall be held in escrow.

On November 15, 2011, PLCA sent a copy of the November 15 agreement to the Union, which signed it. The next day, Michels sent a letter to the Fund notifying it that Michels was, pursuant to the November 15 agreement, terminating its contributions to the Fund effective immediately. The PLCA sent a similar letter the same day. Its letter added: "For obvious reasons, it is imperative that the termination date of each member's contribution obligations be effective prior to December 31, 2011. This date means the members have less than 45 days to address any objection with the notice of termination you may choose to raise." (PLCA believed that its withdrawal liability would be significantly higher if the withdrawal was not effective until after the end of calendar year 2011; that issue fell by the wayside and is not relevant to this appeal.)

The PLCA followed up with several letters to the Fund sent between November 28, 2011, and the end of the calendar year. These letters each asked if PLCA's members (including Michels) needed to take any further action to ensure that the divorce from the Fund was effective. The Fund did not respond until January 30, 2012, when it informed the Union that the Fund had determined that none of the PLCA members effectively withdrew during 2011 because none of the letters from the PLCA and Michels "was effective to terminate any

of the PLCA members' obligations to contribute to the Fund." The PLCA and the Union concluded a new collective bargaining agreement at the end of May 2012. The Fund received written notice of this agreement on October 9, 2012. No one disputes that no later than that date, Michels and the other PLCA employers had withdrawn from the Fund.

Meanwhile, on March 15, 2012, Michels initiated a lawsuit seeking a declaratory judgment that its duty to contribute to the Fund ended on November 15, 2011. The Fund filed its amended counterclaim on August 2, 2012. The district court had jurisdiction over both Michels's complaint and the complaint filed by PLCA (which intervened in the district court) under 28 U.S.C. § 1331 and Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. It had jurisdiction over the Fund's counterclaim under 28 U.S.C. § 1331 and Section 502(e)(1) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(e)(1).

On cross-motions for summary judgment, the district court ruled in favor of the Fund and against Michels and PLCA. Using numbers to which the parties had stipulated, it held that Michels had to pay the Fund $895,565.48 for the principal contributions it owed from November 2011 until October 2012 and $336,670.96 for interest, statutory damages, and fees. The court entered its final judgment on December 2, 2014; it re-entered the judgment two days later to make a technical correction to the caption of the case. Michels and PLCA both appealed.

## II

Before we move to the main event, we offer a word about standard of review, to explain why we do not consider it dispositive here. We then address the question whether the 2006 CBA remained in full effect by virtue of the numerous extension agreements that were concluded, or if it terminated and each extension agreement functioned as an interim CBA between PLCA and the Union. If the former is the case, as the district court thought, then the parties had no right to eliminate the contribution obligation in the November 15, 2011, agreement. If the latter is the better characterization, then the obligation to contribute died no later than November 15, 2011, when the parties eliminated it in a written agreement and communicated that agreement to the Fund.

A

Michels and PLCA argue that this court should approach the dispute unencumbered by any deference to the Fund's position; they stress that we are reviewing a grant of summary judgment, and *de novo* review typically applies in that situation. *Orr v. Assurant Employee Benefits*, 786 F.3d 596, 600 (7th Cir. 2015). The Supreme Court held in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that in actions challenging denials of benefits based on plan interpretations the proper standard of review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115. Phrasing this more generally, review is deferential over decisions that have been committed to the discretion of the plan administrator. See, *e.g., Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 653 (7th Cir. 2001) (arbitrary and capricious standard applied to trustees' determination regarding interest and

penalties owed on delinquent contributions where the plan provided the trustees the power to construe provisions of the collective bargaining agreement). If the particular type of decision has been delegated to the administrator, then deference is owed both to the decision and to the plan interpretation that led to it. At the threshold, however, the court must decide which matters were entrusted to the administrator and which were not. (This is something like what happens when parties debate whether a particular matter lies within the scope of an arbitration agreement: courts usually decide that question, although it is possible for the parties to agree to submit it to the arbitrator. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).)

In order to determine whether an issue has been assigned to the administrator, it is necessary to consult the plan documents to see what the parties have said. This involves the familiar process of contract interpretation, for which *de novo* review is proper. We also address questions of law independently. See *Trustees of Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Leaseway Transportation Corp.*, 76 F.3d 824, 829 (7th Cir. 1996). To the extent that the CBA is pertinent, we note that the Supreme Court recently has reminded us that "[w]e interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law … ." *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).

The Fund argues that the governing language appears in Article V, section 2 of the Revised and Amended Trust Agreement for Central States, Southeast and Southwest Areas Pension Fund (Trust Agreement), which reads as follows:

All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Fund or the operation thereof, whether as to any claim for any benefits preferred by any participant, beneficiary, or any other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or of this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise, shall be submitted to the Trustees, or to a committee of Trustees, and the decision of the Trustees or of such committee thereof shall be binding upon all parties or persons dealing with the Fund or claiming any benefit thereunder. The Trustees are vested with discretionary and final authority in making all such decisions, including Trustee decisions upon claims for benefits by participants and beneficiaries of the Pension Fund and other claimants, and including Trustee decision construing plan documents of the Pension Fund. To the extent this section is contrary to or inconsistent with a Named Fiduciary Agreement, this section shall be inapplicable.

The category "any writing, instrument or accounts in connection with the operation of the Trust Fund" is very broad. Nonetheless, there are good reasons to think that the CBA does not qualify. The CBA itself does not describe or summarize the terms of the plan. It is, however, a document that is related to the plan. Even so, there is nothing in the Trust Agreement that purports to confer on the Trustees the power to interpret agreements between third parties—even agreements to determine the date on which an employer and a union jointly agree to withdraw from the Fund. Moreover, no

employer is required by law to participate in any particular fund, or indeed in any fund at all. See *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) (noting with regard to pensions that "[n]othing in ERISA requires employers to establish employee benefits plans" or "mandate[s] what kind of benefits employers must provide if they choose to have such a plan"). If we had to decide, we would thus be inclined to say that the scope of the 2006 CBA and the proper legal characterization of the extension agreements are both decisions that lie outside the scope of Article V, section 2.

But in the end it does not matter how we characterize the 2006 CBA. Even under ERISA's arbitrary and capricious standard of review, a plan administrator's "interpretation may not controvert the plain language of the document." *Cottillion v. United Ref. Co.*, 781 F.3d 47, 55 (3d Cir. 2015). As we previously have noted, "[i]n some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 1002 (7th Cir. 2013) (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). This is one of those cases.

B

Under ERISA, plan fiduciaries are obliged to assure the financial integrity of a plan by, among other things, "holding employers to the full and prompt fulfillment of their contribution obligations." See *Central States, Southeast & Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 574 (1985). The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) "arose out of Congress' fear that any time an employer withdrew from a multiemployer pension plan

(MPP) under ERISA it could set off a domino effect that, 'much like a bank run,' could leave the MPP unable to pay its vested obligations." *Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 204 F.3d 736, 739 (7th Cir. 2000) (citation omitted). ERISA provides that an employer's obligation to contribute to a plan arises either "under one or more collective bargaining (or related) agreements, or … as a result of a duty under applicable labor-management relations law … ." 29 U.S.C. § 1392(a). The present case does not rest on any independent legal duty; we can thus disregard the second option under the statute.

Section 515 of ERISA provides that an employer "who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The statute also dictates when the obligation to contribute ceases: "a complete withdrawal from a multiemployer plan occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). The date of complete withdrawal is defined as "the date of the cessation of the obligation to contribute or the cessation of covered operations." *Id.* § 1383(e).

In our case, Michels's obligation to contribute is tied exclusively to the 2006 CBA. See *Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefits Plan A*, 872 F.2d 1069, 1072 (D.C. Cir. 1989); see also *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 135 (2d Cir. 2012). The Fund recognizes this, but it argues that the 2006 CBA did not expire

until the end of May 2012. Before that, it says, the parties extended the 2006 CBA numerous times, and therefore Michels never acquired the right to withdraw. It concedes that the November 15, 2011, extension purported to eliminate the obligation to contribute to the Fund, but it says that this language was inconsistent with Article III, section 7(a) of the Trust Agreement, which provides that "[a]n employer is obliged to contribute to the Fund *for the entire term of any collective bargaining agreement accepted by the Fund* on the terms stated in that collective bargaining agreement … ." (Emphasis added.) This language, it concludes, makes the attempted repudiation of the obligation to contribute ineffective.

None of the cases upon which the Fund relies support its position. In *Central States, Southeast & Southwest Areas Pension Fund v. Auffenberg Ford, Inc.*, 637 F.3d 718, 721 (7th Cir. 2011), we considered the validity of an oral agreement governing an employer's duty to contribute to a fund. This, we found, was insufficient to override the written requirement for contributions found in the governing CBA. See also 29 U.S.C. § 1102(a)(1). The decision in *Central States, Southeast & Southwest Areas Pension Fund v. Waste Management of Michigan, Inc.*, 674 F.3d 630 (7th Cir. 2012), is also inapposite. There we rejected an employer's effort to terminate its contribution obligations before the stated expiration date of a CBA. No question about the effectiveness of post-expiration extension agreements was before the court. *Central States, Southeast & Southwest Areas Pension Fund v. Fingerle Lumber Co.,* No. 08 C 1886, 2009 WL 1137793 (N.D. Ill. April 22, 2009), came to a similar result. There the bargaining parties had initially agreed to make contributions up to a particular date, and later they agreed on an earlier time. The court held that they could

not advance their withdrawal date, because the Fund had relied on the initial duration of the agreement.

The present case differs from each of these. First, we are not evaluating any oral agreements. Second, no one tried to withdraw on a date earlier than the one specified in the 2006 CBA (January 31, 2011) or even earlier than the date in the ninth extension agreement, November 15, 2011. To the contrary, Michels complied with its contribution obligations through the November date. The Fund had no reason to think that the parties would extend the 2006 CBA even a minute beyond November 15, 2011. It learned the two critical points here at the same moment: there would be another extension, but the 2006 CBA was going to be modified to exclude a contribution obligation.

Michels argues that we should ignore the Trust Agreement and look only to the 2006 CBA. The language of the statute provides some support for this position. Under 29 U.S.C. § 1381, a withdrawal is effective when the employer "permanently ceases to have an obligation to contribute under the plan." The statute clarifies that "an obligation to contribute" is an obligation "arising under one or more collective bargaining agreements." 29 U.S.C. § 1382(a)(1). By mentioning only CBAs and no other document, the statute indicates that Michels's obligation to contribute is tied to the 2006 CBA. See *Parmac, Inc.*, 872 F.2d at 1072 ("The law is clear that an employer's withdrawal liability under the MPPAA must be determined by looking at the employer's collective bargaining agreement.").

Even if we conclude that the 2006 CBA controls, our job is not finished. That is because the parties disagree about what

document or documents qualify as the governing CBA. Michels argues that the November 15, 2011, extension agreement is the CBA in question, because the 2006 CBA had long since expired. We agree with this analysis. Article XV(C) of the 2006 CBA permitted either party to provide written notice no less than 60 days before the expiration date of its intention to terminate the agreement. PLCA gave such notice to the Union by a letter sent August 9, 2010, well more than 60 days before January 31, 2011. PLCA never revoked that notice, and so the CBA was terminated in keeping with this procedure. At that time, the parties entered a phase during which negotiations were continuing, but no new agreement had been concluded. True, they executed a series of brief extensions that had the effect of carrying forward the *terms* of the 2006 CBA, but they were under no obligation to do so. Each one of these letter agreements stood on its own.

As PLCA and Michels point out, in a somewhat different context this is the way that the National Labor Relations Board (the Board) has understood interim agreements—as binding, stand-alone CBAs. When a union is interested in challenging the role of an incumbent union as the certified bargaining representative, it may file a rival election petition and see how it fares at the workplace. But it cannot do so just anytime. It must wait until the open period 60 to 90 days before the governing collective bargaining agreement expires (or later) before doing so. Before that time, the existing contract bars the rival union's challenge—hence the name "contract bar" to describe this policy. In *Union Carbide Corp.,* 190 N.L.R.B. 191 (1971), the Board had to decide whether a petition for an election that had been filed on August 6, 1970, could go forward or if it was impermissible under the contract bar. As of that date, the Board wrote, the third anniversary of

the 1967 agreement had passed and a petition filed then would have been entertained. But the parties executed a modification of the existing agreement on September 29, 1969, with a new expiration date of October 15, 1972. The Board regarded the modification as a new contract; it rejected the argument that it was incorporated into and made a part of the 1967 agreement. Although the context is different, the *Union Carbide* ruling supports the idea that the various extensions were not merged into the 2006 CBA.

The Fund pushes back with the assertion that its position—that the November 15, 2011 agreement was not a new CBA—squares better with the mechanics of collective bargaining agreements. Labor law requires that for a new collective bargaining agreement to be created, it must be approved by a vote of the membership of the union. See *Booster Lodge No. 405, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. NLRB*, 412 U.S. 84, 86 (1973). The Teamsters Constitution is no exception: it states that a new CBA is "ratified by majority vote of the Local Unions having and exercising jurisdiction over the work covered by the agreement," and it is not binding until after that vote. The Union membership did not vote on any of the one-month extensions to the 2006 CBA. They voted on nothing until the new CBA was presented to them in June 2012. This argument, however, proves too much. It is common in labor relations for one collective bargaining agreement to expire before a new full-blown agreement can be concluded. The parties must, and do, continue to bargain during that interim period, and they often agree to carry forward the terms of the old CBA (perhaps with some modifications) if the bargaining is still fruitful and impasse has not been reached.

C

Even if we downplay the importance of the 2006 CBA, we would come to the same result. The plain language of the Trust Agreement also compels a decision in Michels's favor. The Trust Agreement recognizes two scenarios in which the obligation to contribute may properly be terminated:

> The obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) after termination of the collective bargaining agreement *until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund* or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its contributions at the above-specified address.

Trust Agreement, Article III, section 1 (emphasis added). This provision could not be clearer: the obligation to contribute ends when the fund receives a signed contract that eliminates or reduces the duty to contribute to the fund. That is exactly what the Fund received from Michels on November 16, 2011. Nothing the parties did was inconsistent with this provision. There is nothing noteworthy about the fact that Michels and the other PLCA parties contributed to the Fund during the post-termination months; after all, they were obliged to do so until the Fund received the signed contract eliminating this obligation to which this language refers.

The Fund evidently thinks that the "signed contract" mentioned in Article III, section 1 must be a new CBA, and that the November 15, 2011, agreement was not a new CBA. But the Trust Agreement does not require that the "signed contract" mentioned in Article III, section 2, be a CBA. It would have been easy enough to use that term, not the term "signed

contract." As PLCA points out, the relevant section of the Trust Agreement uses the term "collective bargaining agreement" nine times, while subpart (a) uses the broader phrase "signed contract." The Fund received just such a "signed contract" when the November 15, 2011 agreement, amending and extending the CBA, was delivered to it.

Elsewhere the Trust Agreement also recognizes that there might be something other than a collective bargaining agreement. Article III lists "each new or successive collective bargaining agreement, including but not limited to interim agreements and memoranda of understanding between the parties" as among the items that must be sent to the Fund. The term "interim agreement" describes the extensions (and the November 11, 2015 amendment and extension) perfectly. The conclusion that these were separate agreements thus fits with the language of the 2006 CBA and with the language of the Trust Agreement. In concluding that the November 15, 2011 agreement was insufficient to allow Michels to withdraw from the Fund, the Fund contravened the plain language of the Trust Agreement. Its decision was therefore arbitrary and capricious.

Looking to other agreements only further sinks the Fund's arguments. The National Participation Agreement, which appears as Schedule B of the 2006 CBA, governs the relationship between individual employers and the Fund. After stating that the employers agree to make contributions pursuant to the CBA, the Participation Agreement adds the following proviso: "no amendments or provisions of said trust agreements shall bind the Employer for any financial obligations or dues delinquency determinations beyond that set forth in the Na-

tional Pipe Line Agreement pursuant to which such contribu-tions are made." That language supports a duty to contribute during the life of the 2006 CBA, and during the extensions up until November 15, 2011. It does not support any such duty thereafter, however, because the November 15 agreement sets the financial obligation to the Central States Fund at zero, while at the same time it provides for escrowing money to be given to a successor fund. The Fund's only response to this is to attack the amendment as unauthorized, along the lines we already have outlined. Its argument, however, depends en-tirely on the idea that the 2006 CBA continued in full force until some time beyond November 2011—perhaps all the way until the new collective bargaining agreement was concluded. We are persuaded, however, that this is incorrect, under the agreements that linked these parties, as we discussed in Part II.B of this opinion.

### III

We therefore conclude that the collective bargaining agreement between PLCA and the Union expired in accord-ance with its terms on January 31, 2011. Until November of that year, it was followed by a series of separate agreements, each of which carried the terms of the expired CBA forward. In November, the parties exercised their right to change the term before us now: the duty to contribute to the Fund. They properly notified the Fund in writing of this prospective change. The district court's judgment in favor of the Fund therefore must be, and is, REVERSED.