RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STEVENS ENGINEERS & CONSTRUCTORS, INC.,

*Plaintiff-Appellee,*

*v.*

LOCAL 17 IRON WORKERS PENSION FUND; LOCAL 17
IRON WORKERS PENSION FUND BOARD OF TRUSTEES,

*Defendants-Appellants.*

┐
│
│
│
├ Nos. 16-4098/4099
│
│
│
┘

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 1:15-cv-01965; 1:15-cv-01967—Donald C. Nugent, District Judge.

Argued: October 3, 2017

Decided and Filed: December 13, 2017

Before: CLAY, ROGERS, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Richard L. Stoper, Jr., GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellants. Daniel A. Richards, WESTON HURD LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Richard L. Stoper, Jr., Susan L. Gragel, GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellants. Daniel A. Richards, Morris L. Hawk, WESTON HURD LLP, Cleveland, Ohio, Jeanne V. Gordon, Amy M. Wojnarwsky, CAVITCH, FAMILO & DURKIN CO., L.P.A., Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge.  Under the Multiemployer Pension Plan Amendments Act, part of ERISA, a construction industry employer who withdraws from a multiemployer pension plan owes liability to that plan if the employer conducts work "in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required."  29 U.S.C. § 1383(b)(2)(B)(i).  In accordance with this provision, the Trustees of the Iron Workers Local 17 Pension Fund assessed pension liability against Stevens Engineers & Constructors, claiming that Stevens's activities on a certain construction project involved such work within the jurisdiction of their previous collective bargaining agreement.  As an arbitrator and the district court below found, however, Stevens did not owe pension liability to the Local 17 Pension Fund, because the work identified by Local 17 did not fall within the jurisdiction of the relevant collective bargaining agreement, and did not otherwise require contributions by Stevens.  The collective bargaining agreement instead allowed Stevens to assign jobs like the ones at issue to other trade unions, and a job did not trigger pension liability to the Local 17 Pension Fund if, as here, it was properly assigned to a different union.  Local 17 offers additional arguments as to why Stevens owed withdrawal liability, but these are also unavailing.

**I.**

In 1980, Congress passed the Multiemployer Pension Plan Amendments Act (MPPAA), which modified and extended the coverage of ERISA.  Pub. L. 96–364, 94 Stat. 1208 (1980).  ERISA had allowed collective bargaining agreements for employers in large, fragmented industries like construction to collect employer contributions for a single centralized industrywide pension fund, rather than for individual plans for each employer.  *See* 29 U.S.C. § 1301(a)(3).  To avoid incentives for employers to flee when a multiemployer plan became underfunded, the MPPAA imposed a provision for withdrawal liability, under which an employer leaving an industry or a plan would be responsible for paying additional contributions to that plan at the time of their exit.  29 U.S.C. § 1381.  An employer subject to withdrawal

liability owes a proportionate share of the unfunded amount of the plan, determined on the date of exit from the plan. 29 U.S.C. § 1391.

The MPPAA also provides that a plan's sponsor, often an entity supported by the local union, is normally responsible for calculating withdrawal liability, pursuant to the collective bargaining agreement's terms. 29 U.S.C. § 1382. Where an employer and a plan disagree about the existence or extent of such withdrawal liability, the MPPAA also imposes a scheme for resolution of disputes, primarily through arbitration. 29 U.S.C. § 1401. The MPPAA states that, in civil actions to enforce an assessment of withdrawal liability, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." *Id.* § 1401(c).[1]

Although withdrawal liability attaches to most types of employers, a special withdrawal scheme— the one at issue in this case—covers the construction industry. 29 U.S.C. § 1383(b). Under this arrangement, construction industry employers are not subject to withdrawal liability if they completely withdraw from "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." *Id.* § 1383(b)(2)(B)(i). The Ninth Circuit has explained that this provision exists because "the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor." *H.C. Elliott, Inc. v. Carpenters Pension Tr. Fund for N. California*, 859 F.2d 808, 811 (9th Cir. 1988). On these premises, the withdrawal of an employer from work within the jurisdiction of a collective bargaining agreement "do[es] not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area." *Id.* at 812 (quoting H.R. Rep. No. 96–869, 96th Cong., 2d Sess, pt. 1, at 75). At the same time, "[t]he withdrawal of any employer from the plan does decrease the base, however, if the employer stays in the industry but goes non-union and ceases making payments to the plan." *Id.* In those latter circumstances, the MPPAA provides that an employer must pay a proportional share of the unfunded amount in the plan, determined based on the employer's share of

---

[1]The MPPAA does not contain any provision establishing the standard of review for conclusions of law.

contributions for work prior to withdrawal, rather than after withdrawal. 29 U.S.C. § 1391(b)(1)(A).

The Iron Workers Local 17 Pension Fund (Fund) is a multiemployer pension plan subject to the MPPAA. It provides pensions for members of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local Union No. 17 (Local 17). The Board of Trustees of the Iron Workers Local 17 Pension Fund oversees and administers the Fund. The Fund is severely underfunded, with a deficit of over $170 million. An employer that withdraws from the Fund and cannot avail itself of the construction industry exception thus faces significant liability.

Stevens Engineers & Constructors (Stevens) is a company in the building and construction industry. Stevens specializes in heavy industrial construction, and at any given time generally employs several hundred union workers in a variety of trades. Between 1985 and April 2013, Stevens was a party to a series of collective bargaining agreements (CBAs) with Local 17, pursuant to which Stevens paid into the Fund. Like all previous CBAs, the final CBA between Stevens and Local 17 contained a statement of the jurisdiction establishing where the CBA applied. Article I of the CBA defined "craft jurisdiction," the ironworker work covered by the CBA, as the "unloading, handling, fabrication, re-fabrication, erection, and dismantling of structural, ornamental, reinforcing steel, metals, plastic, [and] composite and engineered materials." Article II of the CBA defined the "territory" of the CBA as a geographic range covering various counties in Northern Ohio. Jobs within the craft jurisdiction and the geographic jurisdiction of the CBA required payment by Stevens into the Fund, and Stevens made payments when so required.

The CBA between Stevens and Local 17 contained an additional qualifier. The craft jurisdiction section stated that the jurisdiction of the CBA was "subject to . . . Agreements, national in scope between the International and other International Unions covering work jurisdiction and [the] allocation and division of work." The CBA included this section because the jurisdiction claimed by craft unions in the construction industry can often overlap, and so unions have enacted various agreements allowing work divisions among crafts. Where work is

assigned to one union through an assignment agreement, it is not within the domain of another union, and thus not subject to employer pension liability to that other union.

One work assignment agreement incorporated into the CBA was the National Maintenance Agreement (NMA). The NMA is a longstanding arrangement covering various craft unions, including ironworkers and millwrights, in construction projects, and directing which unions receive which work. The NMA provides that, where multiple unions can claim the same work, employers must conduct a pre-job conference to assign work on a project. Once a job is assigned through a pre-job conference, it belongs to the assigned craft union. Where a dispute continues following a pre-job conference, the NMA provides for a neutral umpire to resolve the dispute. If not challenged under the NMA, a task stands as assigned, and does not fall within the purview of any other union.

In April 2013, Stevens terminated its collective bargaining agreement with Local 17 and announced its intention not to directly employ any ironworkers on any future projects. Instead, where a Stevens project required ironworkers, Stevens would hire subcontractors to complete that work. As a result, Stevens ceased making contributions to the Fund. Stevens has not directly hired ironworkers since the termination of the CBA.

In September 2013, Stevens won a contract to renovate and install new equipment at the U.S. Steel No. 4 Seamless plant in Lorain County, Ohio, an area within the geographic jurisdiction of the previous Local 17 CBA. In accordance with the NMA, Stevens held a pre-job conference, at which Stevens announced that millwrights and not ironworkers would perform demolition and power rigging tasks for the No. 4 Seamless project. Power rigging involves the movement, handling, and removal of certain mechanical devices on construction sites. In previous jobs, Stevens had often assigned power rigging tasks to ironworkers, but in others, Stevens had chosen millwrights to do that work. Other employers subject to the NMA also assign rigging work to craft unions other than ironworkers.

Three days after the pre-job conference, a representative of Local 17 contacted Stevens to object to the job assignments. Local 17 protested Stevens's assignments as inconsistent with another inter-union agreement, the 1971 Ironworker Millwright Rigging Agreement, stating that

ironworkers would have priority in power rigging work. The 1971 rigging agreement had been abrogated by the millwrights in 2005 and was no longer in force, but some construction employers continued to make assignments consistent with that agreement's terms. Stevens responded that it would not change the assignments on the No. 4 seamless site. The next step in the NMA process required Local 17 to submit its claims for dispute resolution; however, the union did not pursue the dispute further. The Trustees of the Fund did not participate in this process.

During Stevens's work at No. 4 Seamless, two irregularities occurred. One night in November 2013, laborers working for Stevens installed a three- to four-square-foot area of rebar on the site. In the pre-job conference, Stevens had assigned rebar installation exclusively to ironworkers. The next morning, when a Stevens manager discovered that the laborers had installed this rebar, the Stevens manager stated that the laborers had not been authorized to complete the task, apologized to the ironworkers, and stated that only ironworkers were permitted to do that work. Similarly, in January 2014, a subcontractor informed Stevens that millwrights were installing iron grating and handrails, despite Stevens's assignment of that work to ironworkers. Stevens immediately ordered the millwrights to cease that work. The total amount of ironworker activities wrongly performed by other crafts amounted to twenty hours, or less than two-tenths of one percent of all ironworker work.

On November 13, 2013, about two weeks after the pre-job conference, the Fund Board of Trustees passed a resolution holding that Stevens was performing work for which Stevens had previously used ironworkers, namely the demolition and power rigging work. In consequence, the Trustees voted to impose withdrawal liability on Stevens. The Fund used the abrogated 1971 Rigging Agreement as the basis for its assessment that it was entitled to payment for the work done by Stevens. The Fund presented Stevens with a demand for $5,056,017, the amount of the withdrawal liability it calculated Stevens owed. Stevens requested that the Trustees review their own determination, pursuant to an ERISA provision allowing employers the right to such reviews. *See* 29 U.S.C. § 1399(b)(2)(A). After hearing evidence from Stevens, the Trustees reconfirmed their own jurisdiction over Stevens.

Stevens moved to submit the claims to arbitration, pursuant to ERISA's mandatory-arbitration clause. *See* 29 U.S.C. § 1401(a)(1). During the discovery phase of the arbitration, the Fund learned of two additional activities by Stevens that it counted as irregularities. Prior to the pre-job conference, millwrights employed by Stevens had moved machinery at the No. 4 Seamless site. Likewise, laborers employed by Stevens had drilled a few holes for rebar on the site. The Fund had not known about these activities when it imposed withdrawal liability on Stevens, and the activities did not serve as a basis for its determination that Stevens had performed work subjecting Stevens to withdrawal liability.

After hearing four days of testimony, the arbitrator found that Stevens was not subject to withdrawal liability. The arbitrator concluded that Stevens had not conducted "work in the jurisdiction of the collective bargaining agreement" because Stevens had assigned power rigging and demolition tasks to the millwrights through the NMA. Although recognizing that the Fund's assessment of liability enjoyed a presumption of correctness, the arbitrator found that this presumption did not require liability against Stevens here, because the Fund's conclusion was clearly erroneous. The arbitrator also found that Stevens was not liable for the rebar installation and the millwrights' installation of iron grating, but did not discuss the laborers' drilling holes for rebar and unloading equipment, although it had heard evidence on these latter issues.

Following the arbitrator's award, Stevens brought a civil action against the Fund and the Trustees to enforce the arbitrator's award, and that same day the Fund and Trustees brought an action against Stevens seeking to vacate the award. The district court consolidated both actions into the current case. After motions, the district court granted Stevens's request to enforce the arbitrator's award, concluding like the arbitrator that Stevens had assigned the challenged tasks through the NMA, and so they were not within the Fund's jurisdiction. The district court further rejected the Fund's argument that the Fund should not be bound by Local 17's failure to object to the NMA-provided assignment, and found that the Fund could not independently assess withdrawal liability on Stevens outside of the context of the CBA.

The Fund now appeals.

## II.

Stevens did not owe withdrawal liability to the Fund because the power rigging work it assigned to the millwrights through the NMA was not work within the jurisdiction of the Local 17 CBA, and did not otherwise require contributions by Stevens.  Under the MPPAA, a construction industry employer owes withdrawal liability only when it either "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" or "resumes such work within 5 years . . . ."  29 U.S.C. § 1383(b)(2).  Here, however, the power rigging work was not work within the jurisdiction of the CBA because the CBA permitted Stevens to assign this work to another union.  The previous CBA between Stevens and Local 17 incorporated "[a]greements, national in scope between the International and other International Unions covering work jurisdiction and allocation and division of work," and it is not contested that the NMA is one such incorporated agreement.  The NMA, in turn, provided that where a job is assigned through a pre-job conference, it belongs exclusively to the union to which it is assigned.  The Fund therefore could not use the power rigging work as a basis for assessing withdrawal liability here, because the job's assignment to the millwrights in the pre-job conference meant it was within the jurisdiction of the millwrights rather than the ironworkers.  The work thus did not trigger the "perform[ance] . . . in the jurisdiction of the collective bargaining agreement"  requirement for 29 U.S.C. § 1383(b)(2) to apply.

This court has never addressed the precise meaning of "jurisdiction" under 29 U.S.C. § 1383(b)(2).  The conclusion that withdrawal liability is defined by the jurisdictional provisions of the relevant collective bargaining agreement is, however, consistent with other courts' approaches to this issue.  For example, the Ninth Circuit has held that an employer who withdrew from the construction industry but continued to own a part of a joint venture of a construction project did not owe withdrawal liability under Section 1383(b)(2) for that ownership, because the employer's CBA when in force would not have required contributions for that ownership.  *Carpenters Pension Tr. Fund for N. California v. Underground Constr. Co.*, 31 F.3d 776, 780 (9th Cir. 1994).  Similarly, the Seventh Circuit has stated in a general analysis of pension liability that, where no other legal duty exists, an employer's "obligation to contribute

is tied exclusively to the . . . CBA." *Michels Corp. v. Cent. States, Se., & Sw. Areas Pension Fund*, 800 F.3d 411, 418 (7th Cir. 2015). Other circuits have also confirmed that a work-assignment process can direct pension contributions to the union to whom the work was assigned. For example, the Eighth Circuit held that a jurisdictional provision like the one here, where work could be assigned to multiple unions, meant that a pension fund of a non-assigned union was "not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union." *Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g*, 217 F.3d 578, 585 (8th Cir. 2000).

The conclusion that withdrawal liability does not accrue from a task outside the jurisdiction of a collective bargaining agreement is also consistent with this circuit's more general precedents on the MPPAA. We have stated that the MPPAA should be constructed strictly according to its text rather than through definitions "constructed in the dim light of common-law inference." *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC*, 585 F.3d 281, 286 (6th Cir. 2009). Applying that principle here means applying the construction industry exception to withdrawal liability as it exists in the MPPAA, and the MPPAA provides that withdrawal liability only attaches to work "in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(b). The straightforward interpretation of that text offers no grounds on which the Fund can assess withdrawal liability, because the Fund does not show that the CBA required contributions for work within the jurisdiction of another union.

To be sure, we have also acknowledged that the MPPAA expresses a general policy in favor of making employers who withdraw from an underfunded fund pay into it. *See Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 743 (6th Cir. 2013). We did not say, however, that this policy extends to finding liability where it would not otherwise exist. Where, as here, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles also embodied in the MPPAA.

Indeed, interpreting the "jurisdiction" triggering withdrawal liability under 29 U.S.C. § 1383(b)(2)(B)(i) to be the jurisdiction established by a collective bargaining agreement is more consistent with the specific policy behind withdrawal liability, and the particular rationale for the construction industry exception. As the Ninth Circuit has explained, the MPPAA imposes withdrawal liability to avert the scenario in which "the employer stays in the industry but goes non-union and ceases making payments to the plan." *H.C. Elliott, Inc.*, 859 F.2d at 811. That incentive to gain the benefit of work without the detriment of pension liability does not exist, however, where an employer takes on a job that would not have required pension payments. Before its withdrawal from the CBA, Stevens would not have owed contribution liability to Local 17 for work properly assigned to another union through the NMA. It therefore causes no imbalance for Stevens to owe no liability for such work properly assigned after withdrawal either.

The Fund raises a series of objections to reading Section 1383(b) as not permitting withdrawal liability where a previous CBA would not have imposed it, but the Fund's contentions all fail. First, the Fund proposes an alternative interpretation of Section 1383(b) in which "jurisdiction" means only "geographic jurisdiction," but this argument is meritless. An opinion of the Second Circuit confirms that the jurisdictional clause of a CBA like the one at issue here covers both "the Union's defined trade and geographical jurisdiction." *Cleveland Wrecking Co. v. Iron Workers Local 40*, 136 F.3d 884, 886 (2d Cir. 1997). The Fund points out that another portion of the MPPAA uses the term "craft and area jurisdiction" as opposed to just "jurisdiction," *see* 29 U.S.C. § 1388(d)(1), but the principle that the greater includes the lesser means that the broad term "jurisdiction" can and does include the narrower variation "craft and area jurisdiction."

The Fund likewise states that interpreting "jurisdiction" to mean craft rather than geographic jurisdiction produces an apparently absurd result of imposing liability where an employer works in a different state. But nothing says "jurisdiction" must apply to only one of craft or geography, and the natural reading is that it applies to both. In other words, the MPPAA's provisions for withdrawal liability mean exactly what they say: an employer owes withdrawal liability for work that would have mandated contributions pursuant to ERISA if the

CBA were still in force. 29 U.S.C. § 1383(b). This clarity means that, notwithstanding the Fund's suggestion, resort to the MPPAA's legislative history is unnecessary because the text is clear. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012).

The Fund also expresses concern that a reading of "in the jurisdiction of the collective bargaining agreement" as covering whatever area a CBA establishes as its own jurisdiction makes redundant the second part of Section 1383(b)'s requirement: "of the type for which contributions were previously required." In fact, these two parts work in conjunction. The limitation "of the type for which contributions were previously required" establishes that an employer does not owe withdrawal liability for actions previously covered by a CBA but not generative of pension liability. *Cf. Carpenters Pension Tr. Fund*, 31 F.3d at 780 (demonstrating such a scenario). Reading both parts in conjunction fulfills, rather than frustrates, the MPPAA's scheme. It ensures that employers will not owe liability for actions after withdrawal that would not have generated liability before.

The Fund also identifies the fact that Stevens, while subject to the CBA, had previously employed ironworkers to do rigging work, as purportedly showing that this rigging work was within the ironworkers' jurisdiction. This argument ignores the point that under the CBA and the NMA, Stevens had the right to assign a job to various unions, and only incurred pension liability to a craft union when a task was so assigned. Knowing that, in the past, Stevens had exercised an option it possessed does not rebut the point that Stevens was not prohibited from assigning jobs to other unions in the future. The Fund finally objects that, even after the abrogation of the rigging agreement, area practice favored the assignment of rigging work to ironworkers, and thus Stevens would have owed liability for rigging work when the CBA was in force. Extrinsic evidence like area practice does not overcome clear contract language, however. *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016). Because this CBA through the incorporated NMA expressly provides flexibility for Stevens to make rigging assignments, a survey of area practice is unnecessary to determine that Stevens could exercise a right that it possessed by the terms of the contract.

### III.

Although only Local 17 and not the Fund was a party to the CBA and capable of challenging work assignments under the NMA, that assignment is binding on the Fund, because the Fund did not have an independent right to assess liability based on a task assigned to another union through the NMA.**[2]**  The Fund points out that, in some ERISA areas, pension funds are not necessarily bound by the failures of relevant unions to assert a fund's claims, and argues that it should be permitted to pursue claims against Stevens.  Here, however, Local 17's action through the NMA was a necessary prerequisite to create obligation to contribute to the Fund, and so the Fund could not assess liability based on work never falling within its jurisdiction.  The Fund's arguments that there was no forfeiture of its independent powers to assess liability thus fail, because no such independent powers existed in this context.

Under the MPPAA's standards for withdrawal liability, a plan sponsor may only assess withdrawal liability on a construction employer who resumes or "perform[s] work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(b)(2)(B)(i).  As discussed above, the jurisdiction of the collective bargaining agreement in this case incorporated the NMA, under which a craft union lacks jurisdiction over jobs properly assigned to another union pursuant to that agreement.  Here, as both the arbitrator and the district court found, Local 17 did not have jurisdiction over rigging work because Stevens assigned that work to millwrights rather than ironworkers.  The NMA process was exclusive and final.  As a result, both the arbitrator and district court correctly concluded that the Fund did not have the power to retroactively determine that Stevens's work was within the jurisdiction of Local 17 based only on the Fund's own authority, because that decision was precluded by the NMA.

The Fund nevertheless seeks the right to decide what tasks belonged to Local 17, regardless of NMA assignment, but the Fund lacks any such power to overturn the NMA's

---

**[2]**To be clear: the Fund does not raise the issue of whether it did or should have possessed an independent standing, separate from that of Local 17, to challenge work assignment through the NMA process.  Rather, the Fund argues that it has the independent authority to subsequently assess liability on Stevens, regardless of rights established via NMA assignment.  We thus leave for another day the question of a pension fund's independent standing to intervene in a process like the NMA.

outcomes. An inter-union dispute process like the NMA establishes the jurisdiction for pension contribution claims, and must be challenged through its own procedures. The Eighth Circuit has held, for instance, that a union pension fund was not entitled to collect contributions from a project assigned to another union, since the assignment of that project had placed it outside the bounds of the relevant union's CBA. *McKenzie*, 217 F.3d at 585. On relatively similarly facts to those here, the *McKenzie* court held that, unless challenged through the inter-union dispute resolution process, "the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union." *Id.* We have in turn cited *McKenzie* for the proposition that a pension fund "should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment issue." *Trs. of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co.,* No. 01–1396, 2002 WL 35018235, at *9 (6th Cir. Oct. 4, 2002). That conclusion is equally valid in this case.

The Fund tries to distinguish *McKenzie* on the basis that "*McKenzie* involved delinquent contributions, not withdrawal liability." If anything, this fact would appear to make *McKenzie* more rather than less persuasive in this case. Under ERISA, delinquent contributions mean that some liability has already accrued, and thus some entity has an entitlement to money, *see* 29 U.S.C. § 1145. By contrast, no entity has any right to withdrawal liability if no such liability actually exists. *McKenzie* is thus applicable to the issues in this case.

In addition, the Fund cites precedents expressing the general point that a plan sponsor is usually not bound by union conduct, but these cases are not relevant to this dispute. These precedents show only that plan sponsors can exercise already-extant rights, but they do not demonstrate any independent power to assess liability by a fund. For example, the Fund points to the fact that the Supreme Court has held that a coal company could not withhold plan contributions because the beneficiary union had gone on strike. *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 466 (1960). In that case, however, the coal company had pledged to pay the fund a specific royalty per ton of coal produced, and had produced that amount of coal. *Id.* at 461–62, 466. Here, by contrast, the Fund's claim did not involve an amount certainly accrued, but rather a liability that never existed in the first place. Likewise, the Fund's observation that ERISA

requires payment from "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan" without reference to others' defenses, *see* 29 U.S.C. §1145, only begs the question of whether Stevens was so obliged to make those contributions here. If Stevens was not otherwise obliged to contribute, then Stevens did not violate this prohibition against not paying required contributions by not contributing sums that Stevens did not owe.

The Fund also identifies various precedents holding that plan sponsors are not subject to estoppel or waiver based on union action, but those cases' procedural rules do not answer the point that substantive liability does not exist here. The Fund contends that Stevens should not avoid withdrawal liability just because Local 17 did not challenge the assignment of work to millwrights through the NMA. It is true that we have held in a deficient-contribution case that a union's failure to comply with terms in a CBA "cannot affect the [pension] Funds' right to collect contributions that are due and owing to the Funds." *Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015). As *G&W Construction* also states, however, this prohibition only applies to contributions that are "due and owing to the Funds." *Id.* The Fund identifies no precedent stating that a union's failure to challenge work assignments can allow a fund to collect contributions not otherwise owed to that fund.

Indeed, our precedents strongly emphasize the primacy of parties' prior arrangements in assessing when liability accrues, since "[f]unds are entitled to rely on the written terms of an existing ERISA plan document or collective bargaining agreement." *Id.* (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989)). In this case, that prior arrangement stated that work assignments would stand as assigned through the job-assignment process, and pension liability follow accordingly, unless challenged at the time of assignment. Because the Fund did not accrue any rights to contribution from work assigned to another craft through the NMA, or otherwise enjoy a right to challenge those assignments, permitting re-assessment now would prove inconsistent with that obligation.

**IV.**

In addition to its main argument on power rigging, the Fund points to tasks—drilling holes for rebar and unloading machinery—completed by Stevens workers but not discovered by the Fund before it assessed withdrawal liability on Stevens, and the Fund argues that these tasks permit its assessment of withdrawal liability. The district court ruled questionably that the Fund could not use after-acquired information to justify its imposition of withdrawal liability,[3] but in any event this information does not subject Stevens to liability to the Fund.

The Fund first points to the fact that it discovered that laborers employed by Stevens drilled holes for rebar installation, but drilling holes in preparation for rebar installation was not within the mandatory jurisdiction of the Local 17 CBA. The craft jurisdiction section of that CBA claimed for the ironworkers the "unloading, handling, fabrication, re-fabrication, erection, and dismantling of structural, ornamental, reinforcing steel, metals, plastic, composite and engineered materials." This list does not include the preparation of a site for metal installation (as opposed to the installation itself), and there was evidence from the arbitration hearing that drilling holes for rebar installation did not fall within the mandatory jurisdiction of the ironworkers. The Fund objects that Stevens had assigned drilling work to ironworkers in the past; however, prior practice does not suffice to form withdrawal liability unless the CBA required the work to be assigned to the ironworkers, *see* 29 U.S.C. § 1383(b). The Fund thus does not offer evidence that this drilling constituted work per se requiring contributions from Stevens, as opposed to only requiring contributions if assigned to the ironworkers.

The Fund also identifies the fact that millwrights unloaded machinery from trucks as work conducted within Local 17's jurisdiction. The NMA, however, permitted assigning this work to non-ironworkers. Because the unloading was assignable work through the NMA, it did

---

[3]The relevant section of the MPPAA creates a presumption that "any determination made by a plan sponsor under [the MPPAA] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(b)(3)(A). The Supreme Court has held that this provision means that an arbitrator "is not only obliged to enquire into the soundness of the sponsor's determinations when they are challenged, but may receive new evidence in the course of his review and adopt his own conclusions of fact." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993).

not fall within Local 17's jurisdiction unless granted to Local 17 through the NMA, which did not happen here. It is true that this occurred before formal assignments at the pre-job conference. Under the NMA, however, a craft union does not have any right to work assignable to another union until after the union is assigned the work through a pre-job conference. Here, the unloading was assignable, and the pre-job conference assigned this work to non-ironworkers. Because Local 17 thus never had an exclusive claim to this work, it does not constitute work imposing liability on Stevens, and the Fund could not use that work to justify withdrawal liability.

## V.

Finally, the various irregularities during the construction process do not lead to withdrawal liability because Stevens was not responsible for them. The Fund identified two instances in which Stevens employees or agents conducted work unquestionably within the duty of ironworkers. In the first case, some carpenters or laborers installed a small portion of rebar on the site. In the second, millwrights installed grating and handrails around a machine. In both instances, however, Stevens did not order this work, was not aware of this work, and ordered it terminated as soon as Stevens learned of it. Under Ohio law, the governing law here, an employer is not responsible for those acts outside the scope of employment, and work is only in the scope of a worker's employment if it is conduct of the kind which he is employed to perform. *Groob v. KeyBank*, 843 N.E.2d 1170, 1177 (Ohio 2006). Here, Stevens assigned ironworker work exclusively to the ironworkers, and neither authorized nor condoned the non-ironworkers performing that work. The district court thus did not err in finding that Stevens was not responsible for work done outside Stevens's control.

## VI.

The judgment of the district court is affirmed.